UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
------------------------------------------------------
                                            :
JOHN DOE,                                   :
                                            :        CASE NO. 1:08-CV-1902
                      Plaintiff,            :
                                            :
    v.                                      :        OPINION & ORDER
                                            :        [Resolving Doc. Nos. 11, 12, 14, 15]
DONALD RUMSFELD, *et al.*,                  :
                                            :
                      Defendants.           :
                                            :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In this challenge to the conditions of and procedures used in detaining an American citizen

at a United States military compound in Iraq, Plaintiff John Doe sues former Defense Secretary

Donald Rumsfeld, other high-ranking United States government officials, and several unidentified

United States officials and agents.  He alleges multiple constitutional violations in his seizure and

detention. [Doc. 4.]

Defendant Rumsfeld moves to dismiss Doe's complaint for failure to state a claim. [Doc. 11.]

The government moves to dismiss for lack of subject matter jurisdiction and for failure to state a

claim; it also moves for a more definite statement as to Doe's right to travel claim. [Doc. 14.] For

the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendants'

motions to dismiss.  In addition, the Court **DENIES** the government's motion for a more definite

statement.

## I.  Background

Case No. 1:08-CV-1902
Gwin, J.

For the purposes of the pending motions to dismiss, the Court accepts as true the following factual allegations made in Plaintiff John Doe's complaint:

In December 2004, Doe, an American citizen and United States Army veteran, traveled to Iraq as a civilian employee of an American-owned defense contracting firm. Doe went to work as an Arabic translator and was detailed to a United States Marine Corps Human Exploitation Team operating in the United States military bases along the Iraq-Syria border. The Human Exploitation Team, a Marine Corps intelligence unit, gathered and developed military intelligence through local Iraqi contacts. [Doc. 4 at 12.] Doe's assigned team comprised Doe, two sergeants, and one lieutenant. The Team operated in Iraq's Anbar Province, a highly volatile region along the western border of Iraq. [*Id.*]

During his tenure in Iraq, Doe worked with the Human Exploitation Team to establish contact with Iraqi Sheikh Abd Al-Sattar Abu Risha. [Doc. 4 at 2.] Doe maintains that, as the Human Exploitation Team's translator and as the first American to open direct talks with Al-Sattar, he served as the main point of contact for all communications between the Sheikh and the Team. Doe also contends that through a series of highly secretive meetings with Al-Sattar, the Sheikh pledged to support the United States and ultimately became "one of America's staunchest allies" by providing the United States military with information to help control insurgencies in Anbar. [Doc. 4 at 2, 13.]

On October 20, 2005, Doe was transported to "Camp Korean Village," a Marine Corps support base, to prepare for his scheduled November 5, 2005 departure from Iraq to the United States for annual leave. [Doc. 4 at 14.] When Doe arrived at Camp Korean Village, a Navy Criminal Investigative Service (NCIS) agent questioned him about his work with the Human Exploitation

Case No. 1:08-CV-1902
Gwin, J.

Team.  In response to the NCIS agent's questions, Doe says he provided a general description of his work with the Team.

On or about November 4, 2005, Doe was transported to Al Asad, a military airbase in Anbar and Doe's scheduled point of departure from Iraq.  Soon after his arrival at Al Asad, Doe was taken to an interrogation room where three NCIS agents and one other official questioned him for approximately four hours. [Doc. 4 at 14-15.] The agents denied Doe's requests to have a representative from his military company or the Human Exploitation Team present during the interrogation.  They also denied his requests for an attorney.  Doe says he refused to answer questions, citing a concern for the confidentiality of sensitive information he had learned during his work on the Team.  The agents searched and confiscated Doe's luggage.  They also handcuffed and blindfolded Doe, and, he says, kicked him repeatedly in the back.  One agent threatened to shoot Doe if he tried to escape. [Doc. 4 at 15.]

Doe was then transported to the airport at Al Asad, where he was helicoptered to a point approximately thirty minutes away and deposited into the custody of the United States Marine Corps.  The Marines strip-searched Doe and placed him in complete isolation in a small cell.

After seventy-two hours of solitary confinement, Doe says he was flown, blindfolded and hooded, to Camp Cropper, a United States military facility near Baghdad International Airport dedicated to holding "high-value" detainees. [Doc. 4 at 16.]

Government officials detained Doe in a military jail at Camp Cropper for more than nine months.  During the first three months of his detention, Doe was held incommunicado in solitary confinement.  On infrequent occasions, Doe was briefly allowed outdoors for short periods after midnight.

Case No. 1:08-CV-1902
Gwin, J.

When prison officials took Doe out of isolation, they moved him into a cell housing suspected Al Qaeda and Arab Socialist Ba'ath Party members hostile to the United States.  Prior to moving Doe, the officials publicized Doe's affiliation with the Department of Defense and his work for the Human Exploitation Team, thereby encouraging the Al Qaeda and Ba'ath Party detainees to physically attack Doe.  Later, prison guards moved Doe into a cell with seven suspected Al Qaeda members, encouraging additional attacks.  Doe says he lived in constant fear for his life. [Doc. 4 at 18-19.]

Doe further alleges that the Camp Cropper prison guards tortured him using "psychologically-disruptive tactics designed to induce compliance." [Doc. 4 at 8.]  Among other things, Doe says they exposed him to extreme cold and continuous artificial light, blindfolded and hooded him, woke him by banging on a door or slamming a window whenever they observed Doe trying to sleep, and blasted heavy metal or country music into his cell at what Doe calls "intolerably loud volumes." [Doc. 4 at 8, 17.] One guard repeatedly choked Doe. [Doc. 4 at 18.]

Government officials also repeatedly interrogated Doe, though they never permitted Doe the assistance of counsel or any other representative.  Doe says he consistently denied any wrongdoing and responded truthfully to the questioning but his interrogators continued to threaten him and accuse him of lying. [Doc. 4 at 19.]

During Doe's detention at Camp Cropper, government officials held two Detainee Status Board hearings to evaluate whether Doe should keep his preliminary designation as a "security internee" or instead be designated an  "innocent civilian" or an "enemy combatant." [Doc. 4 at 19-20.] A letter from the Detainee Status Board President informed Doe that his first status hearing would be held on or after November 30, 2005.  Prior to this first hearing, the Board told Doe that he

Case No. 1:08-CV-1902
Gwin, J.

did not have the right to an attorney and could only present witnesses and evidence "reasonably available" to him at Camp Cropper. [*Id.*] Doe claims that the Detainee Status Board denied his requests for a Judge Advocate General's Corps attorney or to call his Human Exploitation Team members as witnesses.

The Status Board held Doe's first hearing on or about December 22, 2005. [*Id.*] During this short hearing, Doe was not permitted to view evidence against him, to hear testimony against him, or to cross-examine witnesses.  After the hearing, the Board ultimately deemed Doe a threat to the Multi-National Forces in Iraq and authorized his continued detention. [Doc. 4 at 20-21.]

In July 2006 and after detaining Doe for more than an additional six months, the Detainee Status Board held a second hearing regarding Doe's status as an enemy combatant, security internee, or civilian.  The Board once again denied Doe an attorney and stopped him from presenting evidence not "reasonably available" to him at Camp Cropper.  Doe was not permitted to present evidence from his military company or the Human Exploitation Team with which he had worked.  This second hearing lasted much longer than the first, and Doe faced more extensive questioning about his work with Al-Sattar.  In addition, Doe was questioned about his treatment at Camp Cropper and about what he might do if released from the camp. [Doc. 4 at 22.]

The next month, on or about August 10, 2006, Doe was transported, shackled and blindfolded, to Baghdad International Airport, where officials gave him a new United States passport and put him on a military flight to Jordan. [Doc. 4 at 25.] Doe ultimately returned to the United States.

Doe has never been formally charged with a crime.  He claims that his personal property has not been returned to him and that he has been placed on a "blacklist" that prevents American military

-5-

Case No. 1:08-CV-1902
Gwin, J.

contracting firms from hiring him.  Doe also alleges that he has been put on a terrorist "watch" list,

leading United States Customs officers to interrogate him and search his belongings when he returns

from international travel.

On November 3, 2008, Doe filed the instant suit, challenging the conditions of and

procedures used during his confinement, his placement on various blacklists, and the failure to return

his seized property.  Doe brings this action against Donald Rumsfeld, former Secretary of the United

States Department of Defense, in his individual capacity, alleging substantive and procedural due

process violations, as well as denial of access to courts and counsel.  Doe argues that Rumsfeld

personally approved the use of torturous interrogation techniques on a case-by-case basis and that

Rumsfeld maintained control over the release or continued detention of United States detainees.

[Doc. 4 at 40.] Ultimately, Doe says, Rumsfeld authorized the policies and actions that resulted in

violations of Doe's substantive and procedural due process rights, as well as the denial of Doe's

access to courts to challenge his detention. [Doc. 4 at 36.] Doe asks this Court to hold Rumsfeld

personally liable by allowing a money damages remedy under *Bivens v. Six Unknown Named Agents

of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), for these alleged constitutional violations.

Doe also sues Defendants Janet Napolitano, Secretary of the United States Department of

Homeland Security, Robert S. Mueller III, Director of the Federal Bureau of Investigation, Alan

Bersin, Customs and Border Protection Commissioner, and John Morton, Assistant Secretary of the

United States Immigration and Customs Enforcement, in their official capacities, to secure the return

of the property seized upon his detention and for alleged violations of his right to travel.[1]

---

[1]Under Federal Rule of Civil Procedure 25(d), the successor to an officer sued in his official capacity who has
left office after commencement of the suit is automatically substituted as the proper party.  Doe originally sued former
Department of Homeland Security Secretary Michael Chertoff, FBI Director Robert S. Mueller III, former Customs and
Border Protection Commissioner W. Ralph Basham, and former Assistant Secretary of United States Immigration and

Case No. 1:08-CV-1902
Gwin, J.

Finally, Doe brings claims against unidentified officers or agents of the United States, alleging: (1) false arrest, (2) unlawful detention and conditions of confinement, (3) torturous and unlawful interrogation, (4) denial of the right to counsel and the right to confront adverse witnesses, (5) denial of the right to present witnesses and to have exculpatory evidence disclosed, (6) denial of access to courts and to petition, (7) blacklisting, and (8) conspiracy.[2]

The Defendants now seek dismissal of Doe's claims under Rule 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and for failure to state claims upon which relief can be granted.[3] [Doc. 11; Doc. 14.] The government also separately moves for a more definite statement. [Doc. 15.]

## II. Legal Standard

Federal Rule of Civil Procedure 8 provides the general standard of pleading and only requires that a complaint "contain . . . a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 does not require "detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotations omitted). In deciding a motion to dismiss under Rule 12(b)(6), "a court should assume the[] veracity" of "well-pleaded factual allegations," and construe reasonable inferences drawn from those factual allegations in the plaintiff's favor. *Id. at 1950*; *see also District of Columbia Retirement Bd. v. United States*, 657 F. Supp. 428, 431 (D.D.C. 1987). Courts need not, however, accept a plaintiff's legal conclusions as true. Thus, "[t]o

---

Customs Enforcement Julie S. Myers. *See* [Doc. 4.]

[2]Doe's claims against the unidentified officers are not challenged by the Defendants who now move to dismiss Doe's complaint. The Court's disposition of Doe's right to travel claim as against the named government officials, does not affect that claim as against the unidentified officers.

[3]Although Defendant Rumsfeld moves, for summary judgment, in the alternative to his motion to dismiss, the Court declines to convert his motion to one for summary judgment and construes it solely as a motion to dismiss Doe's complaint.

Case No. 1:08-CV-1902
Gwin, J.

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to

'state a claim for relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. 1937 at 1949 (quoting *Bell*

*Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).  The plausibility requirement is not a "probability

requirement," but requires "more than a sheer possibility that the defendant has acted unlawfully."

*Id.*

   Although motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) are

similar in many respects to those under Rule 12(b)(6), a 12(b)(1) motion presents a distinct threshold

challenge.  Such motions "will be successful only if the plaintiff[] fail[s] to carry [his] burden of

showing by a preponderance of the evidence that the Court has the statutory and constitutional power

to adjudicate the claims." *In re Iraq and Afghanistan Detainees Litig.*, 479 F. Supp. 2d 85, 93

(D.D.C. 2007) (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)), *aff'd*

*Mohammed v. Rumsfeld*, --- F.3d ----, 2011 WL 2462851 (D.C. Cir. June 21, 2011).  In evaluating

whether the plaintiff has carried this burden, courts may consider matters beyond the pleadings, but

must still review the complaint liberally and accept all reasonable inferences favorable to the

plaintiff.  *See Davis v. United States*, 569 F. Supp. 2d 91, 94 (D.D.C. 2008).

   Additionally, a district court may require a more definite statement, on a defendant's motion

under Rule 12(e), where a pleading is "so vague or ambiguous that the [defendant] cannot reasonably

prepare a response."  Fed. R. Civ. P. 12(e).  "Rule 12(e) provides defendants with a remedy for

inadequate complaints that fail to meet the minimum pleading standard set forth in Rule 8(a)."

*McQueen v. Woodstream Corp.*, 244 F.R.D. 26, 34 (D.D.C. 2007).  However, such motions are

generally disfavored. *Rahman v. Johanns*, 501 F. Supp. 2d 8, 19 (D.D.C. 2007).  "Given the liberal

nature of the federal pleading requirements, courts are reluctant to compel a more definite statement

Case No. 1:08-CV-1902
Gwin, J.

. . . [for] fear that such action will become a substitute for discovery." *Potts v. Howard Univ.*, 269 F.R.D. 40, 42 (D.D.C. 2010).

### III. Cause of Action under the Detainee Treatment Act

Doe first argues that the Detainee Treatment Act of 2005 ("DTA"), 42 U.S.C. §§ 2000dd *et seq.*, gives him either an express or implied private right of action to challenge the conditions of his nine-month detention at Camp Cropper. [Doc. 4 at 27; Doc. 33 at 10-11.] However, because the language of the Act is silent as to a private right of action for citizens, and because courts must refrain from inferring statutory causes of action in the absence of clear statutory intent, Doe cannot bring his claims under the DTA.

Doe relies on the language of the DTA, which proclaims that "[n]o individual in the custody or under the physical control of the United States government . . . shall be subject to cruel, inhuman, or degrading treatment or punishment." 42 U.S.C. § 2000dd(a). The Act further defines "cruel, inhuman, or degrading treatment or punishment" to include acts prohibited by the Fifth, Eighth, and Fourteenth Amendments. *Id.* This language, however, contains no express provision for a private cause of action that would permit plaintiffs like Doe to sue under the DTA. *Detainees Litig.*, 479 F. Supp. 2d at 107 n.23.

Nor may the Court, without an express statutory right of action, imply a private cause of action under the Act. Rather, it is for Congress to create private rights of action to enforce federal statutes. *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) (federal courts may not raise up a cause of action to enforce statutory law where the statute itself has not created one). Though Doe contends that the Act's reference to "civil action" and "civil . . . liability or damages" evinces a statutory intent to create a private remedy, this argument runs counter to the rest of the Act's

Case No. 1:08-CV-1902
Gwin, J.

language.  *See id. at 286* ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."). Such references, to the extent they even contemplate private civil actions, pertain only to suits involving the "detention and interrogation of aliens," 42 U.S.C. § 2000dd-1(a), and do not raise a cause of action for citizen detainees.  Accordingly, because there is insufficient indication that Congress intended to create a private right of action for citizens to enforce the DTA, the Court declines to infer such a cause of action and grants Defendant Rumsfeld's motion to dismiss to the extent Doe's claims rest on alleged violations of the DTA.

## IV. *Bivens* Remedy

Doe next urges this Court to recognize a private right of action under *Bivens v. Six Unknown Named Agents* for money damages based on the constitutional violations alleged in his complaint. 403 U.S. 388.

In *Bivens*, the United States Supreme Court established that where federal officials violate a constitutional right, victims of that violation have a private cause of action for money damages against the officials in federal court, even if no statute explicitly creates such a cause of action. *Id. at 396*.  The *Bivens* Court allowed a suit against federal narcotics agents based on alleged Fourth Amendment violations, finding that the plaintiff's cause of action could be implied directly from the face of the Constitution.  The Court held that, as a universal premise, "'where federally protected rights have been invaded . . . courts will be alert to adjust their remedies so as to grant the necessary relief.'" *Id. at 392* (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)); *cf. Bush v. Lucas*, 462 U.S. 367, 374 (1983) (finding that 28 U.S.C. § 1331's general jurisdictional grant to decide cases arising under the Constitution not only grants federal courts the authority to decide whether a constitutional

-10-

Case No. 1:08-CV-1902
Gwin, J.

violation occurred, "but also the authority to choose among available judicial remedies in order to vindicate constitutional rights." (citing *Hood*, 327 U.S. at 684)).  The Supreme Court has since recognized that, in addition to compensating victims, a fundamental purpose of *Bivens* is to deter individual officers from committing constitutional violations.  *See Corr. Serv. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) (citing *FDIC v. Meyer*, 510 U.S. 471 (1994)).

In allowing for a damages remedy directly under the Constitution, the *Bivens* Court noted that the case before it "involve[d] no special factors counseling hesitation in the absence of affirmative action by Congress." *Bivens*, 403 U.S. at 396.  In *Wilkie v. Robbins*, the Supreme Court clarified this and held that a remedy under *Bivens* "is not an automatic entitlement." 551 U.S. 537, 550 (2007).  Rather, the *Wilkie* Court said, courts must follow a two-step process in deciding whether to recognize a *Bivens* remedy.  First, they must determine "whether any alternative, existing process for protecting the interest" exists.  *Id.* (citing *Bush*, 462 U.S. at 378); *see Bivens*, 403 U.S. at 397 (recognizing that implied remedies under the Constitution may be unnecessary upon "explicit congressional delegation" that claims "must instead be remitted to another remedy, equally effective in the view of Congress.").  Second, courts must independently determine whether "any special factors" counsel judicial hesitation.  *Wilkie*, 551 U.S. at 550 (quoting *Bush*, 462 U.S. at 378).  If alternative remedies or special factors counseling hesitation are present, a damages remedy may not be implied under *Bivens.*

Rumsfeld argues that allowing monetary damages in this case would constitute a "radical extension of *Bivens*." [Doc. 11 at 16 (citing *Detainees Litig.*, 479 F. Supp. 2d at 103-107).]  Specifically, Rumsfeld says that recognizing a *Bivens* action here would ignore several special factors counseling hesitation that are rooted in institutional competence and practical national

Case No. 1:08-CV-1902
Gwin, J.

security concerns. [Doc. 11 at 15-26.] Because, however, this Court concludes that no remedy

outside of *Bivens* exists for plaintiffs like Doe and that no special factors counsel judicial hesitation,

the Court finds that Doe may maintain a federal cause of action against Rumsfeld under *Bivens*.

*A. Availability of a* Bivens *Cause of Action*

Rumsfeld first argues that this Court should refuse to recognize a *Bivens* remedy here because

the Supreme Court disfavors *Bivens* actions and has cautioned against allowing them in new

contexts.  [Doc. 11 at 16.]

To be sure, in the years since *Bivens*, the Supreme Court has infrequently permitted such

implied rights of action.  Post-*Bivens*, the Supreme Court only twice considered and approved of

money damages against federal officers:  for violations of the Fifth Amendment's Due Process

Clause, *Davis v. Passman*, 442 U.S. 228 (1979), and the Eighth Amendment's Cruel and Unusual

Punishment Clause, *Carlson v. Green*, 446 U.S. 14 (1980).[4/]  *See also United States v. Stanley*, 483

U.S. 669, 678 (1987) (recognizing that the Supreme Court has "held that actions for damages could

be brought directly under the Due Process Clause of the Fifth Amendment, and under the Eight

Amendment's proscription against cruel and unusual punishment . . . ." (internal citations and

quotations omitted)).

But the Court has neither overruled *Bivens* nor explicitly precluded additional *Bivens*

remedies.  Instead, where the Supreme Court has declined to recognize a cause of action under

*Bivens*, that decision has always relied upon the presence of alternative remedies for the alleged

constitutional violation or special factors counseling judicial hesitation.  *See, e.g.*, *Schweiker v.*

---

[4/]In *Carlson*, the Supreme Court found that "[a] federal inmate serving a prison sentence can employ *Bivens*
to seek damages resulting from mistreatment by prison officials.  It would be odd if a federal detainee not charged with
or convicted of any offense could not bring an analogous claim." *Arar v. Ashcroft*, 585 F.3d 559, 605 (2d Cir. 2009)
(Sack, J.dissenting) (internal citation omitted).

-12-

Case No. 1:08-CV-1902
Gwin, J.

*Chilicky*, 487 U.S. 412 (1988) (acknowledging a reluctance to extend *Bivens*, but ultimately finding

a *Bivens* remedy unavailable because of comprehensive Social Security administrative remedies);

*Bush*, 462 U.S. 367 (*Bivens* remedy for First Amendment violation precluded by elaborate statutory

remedial system); *Chappell v. Wallace*, 462 U.S. 296 (1983) (unique military disciplinary structure

makes *Bivens* claim for race discrimination inapt).  Though the instant suit may present a new set

of facts, as almost all cases do, it is ultimately the presence or absence of alternative remedies or

special factors that determines the availability of a *Bivens* remedy.  *See Arar v. Ashcroft*, 585 F.3d

559, 572 (2d Cir. 2009) ("Once we have identified the context as 'new,' we must decide whether to

recognize a *Bivens* remedy in that environment of fact and law" based on *Bivens*' two-part inquiry.).

The Supreme Court has never held otherwise.

### B. Alternative Remedies

Rumsfeld does not argue that remedies outside of *Bivens* damages exist for Doe's alleged

constitutional injuries. [Doc. 11 at 25 ("Congress has not enacted a remedy that applies to the facts

of this case.").] Nor does the Court find any.  *See, e.g.*, *supra* Section III (finding no cause of action

for Doe under the DTA).  For plaintiffs in Doe's shoes, therefore, as in *Bivens*, "it is damages or

nothing."  *Bivens*, 403 U.S. at 410 (Harlan, J., concurring); *see also Carlson*, 446 U.S. at 18-19

(*Bivens* claims may not lie "when defendants show that Congress has provided an alternative remedy

which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed

as equally effective." (citations omitted) (emphasis in original)); *Passman*, 442 U.S. at 242 (plaintiffs

without effective means other than the judiciary to enforce constitutional rights must be able to

invoke the courts' jurisdiction).

### C. Special Factors

Case No. 1:08-CV-1902
Gwin, J.

Having found no alternative relief for Doe's alleged constitutional injuries, the Court turns to *Bivens*'s second prong:  whether any "special factors" counsel hesitation in recognizing a cause of action here under *Bivens*.

Special factors counseling hesitation "relate not to the merits of the particular remedy, but to the question of who should decide whether such a remedy should be provided." *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (quoting *Bush*, 462 U.S. at 380).  "According to this principle, courts should avoid creating a new, nonstatutory remedy when doing so would be 'plainly inconsistent' with authority constitutionally reserved for the political branches." *Detainees Litig.*, 479 F. Supp. 2d at 103 (quoting *Chappell*, 462 U.S. at 304).  Even absent a textual commitment of authority of discretion to the political branches, "there nevertheless might be reasons that favor allowing Congress, rather than the judiciary, to prescribe the scope of relief available . . . ." *Id.* (citing *Bush*, 462 U.S. at 380).  For example, where an issue invokes policy considerations that involve "a host of considerations that must be weighed and appraised," resolution of that issue "is more appropriately for those who write the laws, rather than for those who interpret them." *United States v. Gilman*, 347 U.S. 507, 512-13 (1954).

Rumsfeld contends that two important special factors counsel hesitation in offering relief in this case.  First, he argues that allowing a *Bivens* remedy here would improperly lead the Court to review wartime matters and foreign affairs constitutionally committed to the President and to Congress.  Second, Rumsfeld identifies practical institutional competence and national defense concerns that he says further caution against a *Bivens* remedy.  Yet, in large part because the judicial protection of individual liberties is appropriate here, where allowing a *Bivens* remedy does not require a general expansion of judicial authority into core war-making powers, the Court finds that

-14-

Case No. 1:08-CV-1902
Gwin, J.

no special factors preclude Doe's *Bivens* claim.

1. Separation of Powers

In his separation-of-powers argument, Rumsfeld contends that this Court should decline to infer a cause of action in this case because the Constitution reserves authority over military affairs, foreign policy, and national security matters to the coordinate branches. [Doc. 11 at 17.] Specifically, Rumsfeld says that courts should refrain from "judicial reexamination of wartime judgments allegedly made" during a "foreign military engagement that Congress authorized the President to prosecute." [Doc. 11 at 20.]

It is axiomatic that the Constitution commits discretion in military and foreign affairs to the legislative and executive branches. U.S. Const. Art. I, § 8 (Congress has power to provide for common defense, declare war and support armed forces); *Id.* at Art II, § 2 (President is Commander in Chief of the armed forces). Indeed, the "Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them." *Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) (plurality opinion). Courts thus generally defer to Congress or military authorities when such core strategic warmaking powers and concerns over the actual prosecution of war are involved. *Id.* at 535.

Avoiding the "risk of assuming a role that is almost always best suited for Congress," [Doc. 11 at 17], however, does not recommend that courts be entirely powerless to review legislative or executive action during a time of war. Rather, "a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens." *Hamdi*, 542 U.S. at 536 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952)). "Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy

-15-

Case No. 1:08-CV-1902
Gwin, J.

organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Id.* Accordingly, even in times of war, "the war power [granted to the coordinate branches] does not remove constitutional limitations safeguarding essential liberties" that the judiciary has a role in protecting. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934); *see also United States v. Robel*, 389 U.S. 258, 263-64 (1967) ("[T]he phrase 'war power' cannot be invoked as a talismanic incantation to support any exercise of congressional power which can be brought within its ambit."); *Ex parte Quirin*, 317 U.S. 1, 19 (1942) (noting "the duty which rests on the courts, in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty").

This notion is particularly true where, as here, a plaintiff's allegations do not necessarily implicate the "core strategic matters of warmaking" that call more forcefully for deference to the political branches. Though Rumsfeld claims that allowing a *Bivens* remedy would require the Court to intrude into a central wartime decision to detain and interrogate a person "apprehended on the field of battle on suspicion of aiding insurgents," [Doc. 11 at 20], Doe's complaint pleads that Doe was detained on his way out of Iraq, near the end of his tour and at the point of his departure for annual leave. [Doc. 4 at 14.] Doe alleges that he had already left the field of battle—not that he was detained to remove him from active participation in hostilities. Presumptively, Doe would have lost any ability to offer low-level aid to insurgents if he had been permitted to leave Iraq. *See Padilla v. Yoo*, 633 F. Supp. 2d 1005, 1027-28 (N.D. Cal. 2009) (finding no core strategic warmaking power implicated where "[t]here is no allegation that [the plaintiff] was engaged in armed conflict with the United States at the time of his capture or that he was detained as 'a simple war measure' to prevent him from actively serving the enemy." (citing *Hamdi*, 542 U.S. at 518)). Moreover, as to Doe's

-16-

Case No. 1:08-CV-1902
Gwin, J.

procedural due process challenge, the Supreme Court has already evinced a willingness to review (though perhaps to a limited degree) the procedures afforded detainees in challenges to their detention status. *See generally Hamdi*, 542 U.S. 507.

In concluding that judicial protection of individual liberties is appropriate here, this Court is informed by the reasoning of two recent cases that considered, and allowed, American citizens' *Bivens* challenges to the conditions of and procedures used in their military detention. In *Padilla v. Yoo*, the Northern District of California allowed a *Bivens* claim by an American citizen challenging the coercive interrogation techniques used during his detention in a South Carolina military brig. 633 F. Supp. 2d 1005. After weighing separation-of-powers and foreign relations concerns similar to those that Rumsfeld raises here, the *Padilla* court found no special factors precluding a *Bivens* claim. *Id.* at 1027-30. Similarly, in *Vance v. Rumsfeld*, 694 F. Supp. 2d 957 (N.D. Ill. 2010), the Northern District of Illinois allowed two American citizens to make a *Bivens* claim against former Defense Secretary Rumsfeld. On the basis of allegations similar to those made in this case (also challenging detention conditions at Camp Cropper) and against arguments of the same special factors as Rumsfeld now raises, the *Vance* court found that no special factors foreclosed a cause of action under *Bivens*. *Id.* at 972-75. *But see Lebron v. Rumsfeld*, 764 F. Supp. 2d 787 (D.S.C. 2011) (finding special factors precluded a citizen's *Bivens* action against Rumsfeld due to separation of powers and practical concerns).

That the Supreme Court has found special factors present in readily-distinguishable claims based on injuries incident to military service does not (as Rumsfeld would have it) demand that this Court find special factors present here. In *Chappell v. Wallace*, the Supreme Court held that the "special relationship of the soldier to his superiors" and the "unique structure of the military

-17-

Case No. 1:08-CV-1902
Gwin, J.

establishment" were special factors barring a *Bivens* remedy for military personnel claims against superior officers. 462 U.S. at 300 (citations omitted).  The Court then extended *Chappell* beyond the military superior-subordinate relationship to deny, in *United States v. Stanley*, a *Bivens* remedy for "injuries that 'arise out of or are in the course of activity incident to [military] service.'" 483 U.S. at 684 (quoting *Feres v. United States*, 340 U.S. 135, 146 (1950)).  In both cases, the Court turned to "the unique disciplinary structure of the Military Establishment and Congress' activity in the field [of military affairs]" to find that special factors recommended against a *Bivens* remedy. *Id.* at 683 (quoting *Chappell*, 462 U.S. at 304); *but see id.* at 681-82 (declining to adopt rule that would preclude *Bivens* actions by servicemen entirely, and rejecting characterization that "all matters within congressional power are exempt from *Bivens*.").  This case, however, does not present such concerns.

Rumsfeld's separate warning that allowing Doe's claims to proceed would unacceptably inject *Bivens* into foreign affairs is equally unavailing.  Rumsfeld analogizes to *Sanchez-Espinoza v. Reagan* and *In re Iraq and Afghanistan Detainees Litigation* to suggest that a *Bivens* remedy is similarly barred under the present circumstances.  In both cases, the courts determined that the special needs of foreign affairs barred a damages remedy "against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad." *Sanchez-Espinoza*, 770 F.2d at 209; *see Detainees Litig.*, 479 F. Supp. 2d 85.  The *Sanchez-Espinoza* court concluded that "the danger of foreign citizens' using the courts . . . to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgement whether a damage remedy should exist." 770 F.2d at 209.  In *Detainees Litigation*, the court likewise cautioned against allowing "high-ranking military officials [to be] haled into our own courts to

Case No. 1:08-CV-1902
Gwin, J.

defend against our enemies' legal challenges . . . ." 479 F. Supp. 2d at 105.

But Doe is a United States citizen and this case does not involve foreign citizen plaintiffs. The fear of allowing enemy aliens to engage domestic courts in continuing hostilities is not present here. Doe's American citizenship thus cuts strongly in favor of affording him constitutional protections abroad and allowing judicial remedy for the constitutional violations he alleges.[5]  *See id.* at 95 (denying *Bivens* remedy in large part because nonresident alien plaintiffs are not entitled to constitutional protections in the first place); *see also Vance*, 694 F. Supp. 2d at 974 ("[T]he existence of [American] citizenship has gone a long way for recent courts asked to assess the scope of constitutional protection overseas." (citing *Hamdi*, 542 U.S. at 532, and *Padilla*, 633 F. Supp. 2d at 1020)).

Doe's complaint does not ask this Court to assume the authority to make or manage war, or to allow foreign citizens access to courts to obstruct foreign policy. Nor does it require this Court to intrude upon the political branches' authority over military service. Instead, the complaint alleges "constitutional trespass on a detained individual citizen's liberties where the detention was not a necessary removal from the battlefield," *Padilla*, 633 F. Supp. 2d at 1028, and calls upon judicial expertise in safeguarding the citizen's individual liberties and enforcing already-established procedural rights. *See Hamdi*, 542 U.S. 507.

2. Practical Concerns

---

[5]/Rumsfeld's argument that the Supreme Court's decision in *Munaf v. Geren*, 553 U.S. 674 (2008), extends such foreign policy-based "special factors" considerations to American citizen plaintiffs fails. In *Munaf*, the Court found that providing habeas relief to two American citizens detained in Iraq would result in "unwarranted judicial intrusion" into the Executive's authority over warmaking and international relations. *Id.* at 700. However, as Rumsfeld admits, significant to the *Munaf* Court were the foreign policy implications of interfering with Iraq's authority "to punish offenses against its laws committed within its borders." *Id.* at 697-98 (internal quotations omitted). Apart from the several factual distinctions between that case and this one, *Munaf*'s reasoning evinced concern over interference with a foreign criminal system that are not present here. *Munaf* did not gut the importance of citizenship to determining the scope of constitutional protection and the availability of judicial remedy.

Case No. 1:08-CV-1902
Gwin, J.

In addition, Rumsfeld predicts that adverse "real world consequences" will stem from allowing a *Bivens* remedy here, namely, that (1) the threat of liability would impede military decision-making; (2) that allowing a *Bivens* action will force disclosure of sensitive information, require distracting discovery, and will dangerously require removing soldiers from the field to provide testimony; and (3) that Doe's proposed cause of action would "embroil the judiciary in war-related decisions" that are complicated to adjudicate. [Doc. 11 at 22-23.] These concerns are largely unfounded and do not support finding special factors precluding Doe's *Bivens* action.

First, although recognizing a *Bivens* remedy would certainly present the threat of money damages for constitutional violations by military officers, a central purpose of *Bivens* is just that: to raise the cost of unconstitutional behavior. *Malesko*, 534 U.S. at 70. As such, *Bivens* actions permit judicial enforcement of preexisting limitations on unconstitutional conduct precisely to disincentivize such conduct.

In addition, courts regularly handle sensitive information. The state secrets doctrine, for instance, not only allows the government to withhold confidential material related to national security, *Ellsberg v. Mitchell*, 709 F.2d 51, 57 (D.C. Cir. 1983) (state secrets privilege extends to national defense capabilities, intelligence-gathering methods, and diplomatic relations), but may also require dismissal, *Wilson v. Libby*, 498 F. Supp. 2d 74, 94 n.7 (D.D.C. 2007), *aff'd Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008) (*Wilson II*). *See Wilson II*, 535 F.3d at 720-21 (Rogers, J. concurring in part and dissenting in part) (rejecting *Bivens*-related concern over judicial intrusion into intelligence information as precluded by availability of state secrets privilege); *see also Arar*, 585 F.3d at 605, 608-09 (Sack, J., dissenting) (same). To categorically preclude plaintiffs from bringing a *Bivens* action, at this early stage of litigation and where sensitive national security information may

Case No. 1:08-CV-1902
Gwin, J.

be protected by turning to the state secrets doctrine, would require a premature constitutional determination.

Finally, national security or overseas detention issues are not entirely unfamiliar to the judiciary. Determinations such as those presented in this case, though potentially complicated, are within a court's competence, as they involve discerning and preserving the line between constitutional and unconstitutional conduct. *See, e.g.*, *Hamdi*, 542 U.S. 507 (adjudicating the constitutional boundaries of Executive discretion over the process due habeas petitioners detained at Guantanamo); *Sterling v. Constantin*, 287 U.S. 378, 401 (1932) ("What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions."). *Bivens* itself—as well as the Supreme Court's subsequent decisions in *Carlson* and *Passman* allowing *Bivens* remedies for Fifth Amendment and Eighth Amendment violations—required delicate line-drawing in areas involving largely subjective determinations. *Bivens*, 403 U.S. 388 (allowing damages remedy for Fourth Amendment violations based on warrantless arrest and search and use of unreasonable force); *Arar*, 585 F.3d at 603 (Sack, J., dissenting) (describing *Carlson* and *Passman* as allowing *Bivens* remedies in areas within the Executive's expertise or requiring subjective decisionmaking).

Finding that no special factors preclude a *Bivens* remedy for Doe's alleged constitutional claims, and because there are no alternative remedies available for the due process violations of which Doe complains, the Court concludes that Doe may assert a cause of action under *Bivens*.

### V. Qualified Immunity

Rumsfeld next contends that even if Doe could maintain a *Bivens* action against him, Rumsfeld is entitled to qualified immunity on Doe's due process and access to courts claims. [Doc.

Case No. 1:08-CV-1902
Gwin, J.

11.] The doctrine of qualified immunity generally shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine provides immunity from suit and serves "to avoid 'subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching discovery' where the legal norms the officials are alleged to have violated were not clearly established at the time." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (quoting *Harlow*, 457 U.S. at 817-18). Because qualified immunity is an affirmative defense, the initial "burden of pleading it rests with the defendant." *Crawford-El v. Britton*, 523 U.S. 574, 587 (1998) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

In determining whether a defendant is entitled to qualified immunity, the Court must employ a two-part analysis. The Court must determine whether: (1) while viewing the facts in the light most favorable to the plaintiff, a violation of a constitutional right occurred; and (2) the constitutional right at issue was clearly established at the time of the defendant's conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by* *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Thus, even if the Court determines that "a constitutional right would have been violated on the facts alleged," a defendant may still be immune from suit unless he "knew, or [was] unreasonable in not knowing, that [his] behavior violated the Constitution." *Harris v. D.C.*, 932 F.2d 10, 13 (D.C. Cir. 1991). Where, however, the plaintiff's well-pleaded factual allegations, taken as true, show the violation of a clearly-established constitutional right, a defendant's motion to dismiss on grounds of qualified immunity must be denied. *See Iqbal*, 129 S. Ct. 1937 at 1949; *see generally Crawford-El*, 523 U.S. at 588 (plaintiff must show constitutional violation); *Davis v. Scherer*, 468 U.S. 183,

Case No. 1:08-CV-1902
Gwin, J.

197 (1984) (plaintiff must show that constitutional rights were clearly established).

Courts have discretion to decide which of the two inquiries should be addressed first, though if a court finds a constitutional right not clearly established, it need not decide the often more difficult question whether a constitutional right was violated.  *Pearson*, 129 S. Ct. at 818.  Both inquiries, however, require context-specific analysis.  *Saucier*, 533 U.S. at 201.

### A. Causation:  Rumsfeld's Personal Involvement

Because liability under Doe's *Bivens* claims is limited to those who are "personally involved in the illegal conduct," *Simpkins v. D.C. Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997), the Court must first address the issue of Rumsfeld's personal participation in the constitutional violations Doe alleges.  Rumsfeld argues that because Doe's complaint fails to plead sufficient facts supporting Rumsfeld's involvement in the alleged constitutional violations, Doe cannot maintain a *Bivens* action. [Doc. 11 at 29.] At this early stage of this litigation and before any discovery has taken place, the Court finds Doe sufficiently pleads Rumsfeld's personal involvement in the alleged substantive due process violation, but has not done so as to Doe's alleged procedural due process or access to courts claims.

*Bivens* liability may not be imposed on the basis of *respondeat superior*.  *Iqbal*, 129 S. Ct. at 1949.  However, when a defendant is said to have crafted the policies for or authorized facially unconstitutional action, he does not avoid responsibility for the foreseeable consequences of his conduct.  *Barham v. Ramsey*, 434 F.3d 565, 578 (D.C. Cir. 2006) (supervisor can be liable for subordinate's misconduct if he knows of, facilitates, approves, or willingly turns a blind eye to the conduct); *see also Padilla*, 633 F. Supp. 2d at 1033-34 (allegations that government lawyer's legal memoranda "set in motion a series of events" resulting in plaintiff's detention were sufficient to

Case No. 1:08-CV-1902
Gwin, J.

impose *Bivens* liability).

    As to his substantive due process claim, Doe makes several allegations that Rumsfeld crafted

the policies for and authorized the detention conditions and interrogation techniques used at Camp

Cropper.  Doe's complaint alleges that on December 2, 2002, Rumsfeld personally approved a list

of torturous interrogation techniques for use on detainees at Guantanamo.  These techniques, Doe

says, included prolonged interrogation, isolation, and sensory deprivation. [Doc. 4 at 32.] Doe alleges

that Rumsfeld later rescinded his authorization of those techniques, only to "authorize the

Commander of the United States Southern Command to use them if warranted and approved by Mr.

Rumsfeld in individual cases." [Doc. 4 at 33.]

    Though Doe was never detained at Guantanamo, he alleges that in August 2003, Rumsfeld

sent Major General Geoffrey Miller to Iraq to "gitmo-ize" Camp Cropper.  Part of that process, Doe

says, called for Major General Miller to review the United States military prison system in Iraq and

to make recommendations on how to better gather actionable intelligence from detainees. [Doc. 4

at 34.] Doe alleges that, at Miller's suggestion, Rumsfeld directed and approved the Commander of

the Coalition Joint Task Force-7 in Iraq, Lieutenant General Ricardo Sanchez, to sign a

memorandum "authorizing the use of 29 interrogation techniques, which included yelling, loud

music, light control and sensory deprivation." [*Id.*] Even after Sanchez later modified the

memorandum, Doe says manipulation of lighting, heating, food, shelter, and clothing continued to

be used as authorized interrogation techniques. [*Id.*]

    Doe alleges that around the same time, Rumsfeld had convened a "Working Group" to

evaluate his interrogation policies.  Doe maintains that as a result of the working group, Rumsfeld

approved a set of new interrogation techniques including, among others, isolation for up to thirty

Case No. 1:08-CV-1902
Gwin, J.

days, dietary manipulation, and sleep deprivation. [Doc. 4 at 33.] Doe alleges that Rumsfeld

approved these techniques against the backdrop of his knowledge about detainee abuses in Iraq.[6/]

[Id.]

And, according to the complaint, on December 30, 2005, Rumsfeld modified the military's

Field Manual by adding ten classified pages authorizing detention and interrogation techniques of

the sort used on Doe.  Doe says this version of the manual was in operation during his detention at

Camp Cropper and was not replaced until September 2006.[7/] [Doc. 4 at 36.]

Against these allegations, Rumsfeld posits that it is purely speculation that someone like the

Secretary of Defense signed off on the specific interrogation techniques and conditions of detention

imposed on Doe. [Doc. 11 at 31-32.] Although it may be unlikely that Rumsfeld evaluated the

detention conditions of each detainee in detail, it is not implausible that he authorized the use of

interrogation techniques on the detainee population at Camp Cropper, or even on specific detainees.

Though Doe must eventually support his factual allegations with evidence, a motion to dismiss

simply calls upon the Court to evaluate whether a plaintiff has alleged with specificity facts

supporting a plausible claim.  *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556-57).  This

is a notice pleading requirement that acknowledges, particularly in cases such as this one, the often

---

[6/]Doe adds, as further support that Rumsfeld knew of detainee abuses in Iraq, that Colin Powell—then the Secretary of Defense—confirmed that throughout 2003, Rumsfeld was aware of reports published by the Red Cross on abusive detention conditions in Iraq.  According to Doe, Powell stated that he and Rumsfeld kept President Bush "regularly apprised" of these reports. [Doc. 4 at 35.] The Court notes that these allegations are not, on their own, sufficient to support Doe's claim that Rumsfeld authorized the abusive conditions, or was deliberately indifferent to the alleged due process violations at Camp Cropper.  *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994) (holding prison officials liable for deliberate indifference under Eighth Amendment only if they know of substantial risk of serious harm *and* disregard that risk "by failing to take reasonable measure to abate it").

[7/]Rumsfeld contests that any portion of the Field Manual is classified, and argues that the manual remained unmodified between 1992 and September 2006. [Doc. 11 at 31.] Because, for the purposes of a motion to dismiss, courts must generally accept as true a plaintiff's factual allegations, *Iqbal*, 129 S. Ct. at 1949, the Court finds this essentially evidentiary dispute more appropriate for summary judgment or trial.

Case No. 1:08-CV-1902
Gwin, J.

limited information available to plaintiffs at the time of complaint.  At this stage of litigation, the

Court does not evaluate the probability of Doe's success.  *See id.*

At this early stage of proceedings in this case, Doe's allegations sufficiently support his claim

that Rumsfeld was involved in the substantive due process violations related to the conditions of

confinement and interrogation at Camp Cropper.  He has alleged with adequate specificity that

Rumsfeld knew of, ordered, and approved the alleged constitutionally deficient interrogation

methods and detention conditions employed in Iraq.  Doe has thereby identified "enough fact to raise

a reasonable expectation that discovery will reveal evidence" of Rumsfeld's personal involvement

in the alleged torturous treatment.  *Twombly*, 550 U.S. at 545; *see Vance*, 694 F. Supp. 2d at 963-64

(deeming sufficient almost identical allegations that Rumsfeld created a policy expressly authorizing

constitutionally invalid interrogation and detention measures).

However, regarding Doe's procedural due process claim, Doe has not pleaded adequate facts

to support that Rumsfeld personally authorized or was deliberately indifferent to the inadequate

procedures used in the detainee status hearings at Camp Cropper.  According to Doe's complaint,

Rumsfeld was aware that the process afforded detainees in Iraq fell below constitutionally-mandated

levels. [Doc. 4 at 39, 43.] Yet in support of this contention, Doe offers only the fact of a March 6,

2006 Amnesty International report referencing the security internment system's deficient procedural

protections. [Doc. 4 at 37.] Doe also alleges that Rumsfeld had final say over the continued detention

or release of detainees, [Doc. 4 at 40], but does not allege that this authority extended to the status

classification procedures leading to any continued detention or release decisions.

Moreover, Doe's complaint merely proffers that Rumsfeld could have reformed detention

procedures but did not undertake such reform. [Doc. 4 at 39.] Such vague allegations of Rumsfeld's

Case No. 1:08-CV-1902
Gwin, J.

personal involvement are insufficient to support a *Bivens* claim against Rumsfeld for alleged procedural due process violations.

Nor has Doe adequately alleged Rumsfeld's personal involvement in the alleged denial of Doe's access to courts.  Similar to Doe's procedural due process claim, the allegation that Rumsfeld controlled the decision to release detainees does not suggest that Rumsfeld was personally involved in denying detainees access to courts to petition for habeas relief or challenge the conditions of their detention.  Because Doe otherwise complains only generally (and conclusorily) that Rumsfeld's policies prohibited detained citizens from accessing courts, [Doc. 4 at 30, 47], and that Rumsfeld continued such policies even after the Supreme Court "warned" him against them in its *Hamdi v. Rumsfeld* decision, [Doc. 4 at 30], he cannot maintain his denial-of-access claim.

The Court thus finds Doe's allegations of Rumsfeld's personal involvement in the detention and interrogation practices at Camp Cropper sufficiently support a substantive due process claim.  Because, however, Doe offers no factual allegations suggesting Rumsfeld's personal involvement in denying constitutionally-mandated procedural protections at detainee status hearings, or in denying Doe access to courts, the Court grants Rumsfeld's motion to dismiss Doe's procedural due process and denial-of-access claims.

### B. Substantive Due Process

Rumsfeld insists that he is entitled to qualified immunity from *Bivens* liability on Doe's allegations of Fifth Amendment substantive due process violations.  Specifically, Rumsfeld argues that Doe cannot assert a substantive due process right to be free from certain interrogation techniques and conditions of confinement imposed in the specific context of a United States detention facility in Iraq. [Doc. 11 at 47-55.] Rumsfeld adds that, in any case, Doe's asserted substantive due process

-27-

Case No. 1:08-CV-1902
Gwin, J.

rights were not clearly established at the time Doe was held at Camp Cropper. [Doc. 33 at 45-47.]

The Court finds, however, that Doe had a constitutional right to be free from conduct and conditions of confinement that shock the conscience, that such right was clearly established at the time of Rumsfeld's conduct, and that Doe has pleaded factual allegations sufficient to support a claim that Rumsfeld's conduct violated this clearly-established right. Accordingly, Rumsfeld's qualified immunity defense to Doe's substantive due process claim fails.

1. Constitutional Violation

The Supreme Court has long held that certain Executive or government conduct may so "shock[] the conscience," offending basic notions of human dignity and a civilized system of justice, that it violates the Due Process Clause. *Rochin v. California*, 342 U.S. 165, 172-74 (1952). To this end, certain physical abuse or "interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect," can violate the Due Process Clause under the "shocks the conscience" standard. *Miller v. Fenton*, 474 U.S. 104, 109 (1985); *see also Palko v. Connecticut*, 302 U.S. 319, 326 (1937) (noting that under the Due Process Clause, "there would remain the need to give protection against torture, physical or mental."), *overruled in part on other grounds by Benton v. Maryland*, 395 U.S. 784, 794 (1969); *cf. Brown v. Mississippi*, 297 U.S. 278, 285-86 (1936) (holding that confessions coerced through means offensive to fundamental principles of justice cannot support a conviction).[8]

Here, Doe alleges, *inter alia*, that he was detained incommunicado and often in solitary

---

[8] Because Doe was detained in federal custody, his constitutional protection against mistreatment arises under the Due Process Clause of the Fifth Amendment, but these protections are substantially similar to those a detainee in state custody receives under the Due Process Clause of the Fourteenth Amendment. In addition, "the due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner." *County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

Case No. 1:08-CV-1902
Gwin, J.

confinement.  He also says he was exposed to extreme and prolonged cold and continuous light, blindfolded and hooded, subjected to sleep alteration and deprivation through exposure to light or blasting music, denied some food and water, and physically assaulted. [Doc. 4 at 8, 17-19.] Although Rumsfeld argues that several of the various practices alleged do not individually shock the conscience, [Doc. 11 at 51], Doe's claim does not rest on allegations of any one condition he says is singularly egregious.  Instead, Doe says several "psychologically-disruptive tactics designed to induce compliance" were used on him throughout his detention at Camp Cropper. [Doc. 4 at 8.] Thus, the Court considers the cumulative impact of the conduct alleged to determine whether the conditions of Doe's confinement could support a substantive due process claim.  *See Rhodes v. Chapman*, 452 U.S. 337, 362-63 (1981) (evaluating Eighth Amendment challenge to conditions of confinement by looking to the totality of the circumstances and cumulative effect of conditions); *see also Vance*, 694 F. Supp. 2d at 966-69 (finding detainees' cumulative allegations of similar detention and interrogation techniques sufficient to suggest torturous conditions of confinement in violation of the Due Process Clause).

Doe contends that Rumsfeld's conscience-shocking conduct was undertaken with an intent to injure, or, alternatively, with deliberate indifference to the harms caused by such conduct. [Doc. 4 at 41-42.] The Court finds that, under either theory of liability,  Doe has stated a substantive due process claim based on conditions of confinement and interrogation methods that shock the conscience.

First, as to an alleged intent to injure, the Supreme Court has held that conduct "intended to injure in some way unjustifiable by any government interest is the sort of action most likely to rise to the conscience-shocking level." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).  Doe

Case No. 1:08-CV-1902
Gwin, J.

alleges that Rumsfeld's actions were aimed to injure, and such allegations are supported by the very

nature of the alleged conduct, which suggests that Rumsfeld crafted the policies for or ordered the

use of detention and interrogation techniques at Camp Cropper with the intent to inflict physical or

psychological harm. *See, e.g.*, *Vance*, 694 F. Supp. 2d at 967 (concluding that allegations of

substantially similar "torturous treatment methods may manifest an inextricable aim to injure those

subject to their use.").

Rumsfeld's argument that the military was "pursuing legitimate government interests, even

if in an allegedly unauthorized manner," [Doc. 11 at 54], does not necessarily justify the

interrogation techniques and conditions allegedly imposed on Doe with intent to harm. *See Norris*

*v. District of Columbia*, 737 F.2d 1148, 1151 (D.C. Cir. 1984) (characterizing *Rochin* as standing

for "the limited principle that government action, even if taken pursuant to legitimate objectives such

as evidence gathering, may not proceed via means that shock the conscience." (quotation and

alteration omitted)); *cf. Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979) (finding that a condition of

pretrial detention reasonably related to a legitimate government objective does not directly amount

to punishment absent a showing of intent to punish but still cannot be excessive in relation to its

alternative purpose); *id. at 539* ("Retribution and deterrence are not legitimate nonpunitive

governmental objectives."). The mere assertion that a government interest in gathering intelligence

motivated its actions does not necessarily void an otherwise properly pleaded constitutional claim.

*Sacramento*, 523 U.S. at 840 (finding a substantive due process violation where officer's actions

"were an abuse of executive power so clearly *unjustified* by any legitimate objective of law

enforcement" (emphasis added)); *see also Wash. Teachers' Union v. Bd. of Educ. of the Dist. of*

*Columbia*, 109 F.3d 774, 781 (D.C. Cir. 1997) ("[S]ubstantive due process prevents governmental

-30-

Case No. 1:08-CV-1902
Gwin, J.

power from being used for purposes of oppression, or abuse of government power that shocks the conscience, or action that is legally irrational [in that] it is not sufficiently keyed to any legitimate state interests." (quoting *Comm. of United States Citizens Living in Nicar. v. Reagan*, 859 F.2d 929, 943-44 (D.C. Cir. 1988) (internal quotations and citations omitted) (second alteration in original)). At the very least, whether evidence ultimately supports Doe's claim that the alleged interrogation techniques and conditions of his confinement were unjustified by any legitimate government interest and were so extreme as to shock the conscience is a question addressed to a stage of litigation when the Court can properly consider such evidence.[9]

Second and alternatively, as to Doe's theory of Rumsfeld's alleged "deliberate indifference" to Doe's substantive due process rights, the Supreme Court has held that to maintain a constitutional due process claims for deliberate indifference, plaintiffs must show "something more than negligence but less than intentional conduct." *Sacramento*, 523 U.S. at 849 (internal quotations omitted). In part to distinguish "deliberate indifference" claims from more widely available liability under common tort law, this lower "deliberate indifference" standard is appropriate only in limited circumstances where an official's deliberate indifference may reach the "point of the conscience shocking." *Sacramento*, 523 U.S. at 849. Such circumstances are present where the government "has a heightened obligation toward the individual," such as when it has taken a person into custody

---

[9]The District of Columbia Circuit has held that in determining whether government conduct rises to the conscience-shocking level, courts consider:

> the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Fraternal Order of Police v. Gates*, 602 F. Supp. 2d 104, 109 (D.D.C. 2009) (quoting *Norris v. District of Columbia*, 737 F.2d 1148, 1150 (D.C. Cir. 1984)). These factors do little to resolve Doe's claim at this stage of litigation, particularly where Doe's complaint contains no indication of any government need for the application of force.

Case No. 1:08-CV-1902
Gwin, J.

and has thus assumed a corresponding duty of "responsibility for his safety and general well-being."

*Butera v. District of Columbia*, 235 F.3d 637, 651-52 (D.C. Cir. 2001) (quoting *Sacramento*, 523 U.S. at 851).

Though Doe says that Rumsfeld may be held liable for deliberate indifference because he had "ample opportunity to consider (and reconsider) the consequences of his actions," [Doc. 29 at 47] (citing *Sacramento*, 523 U.S. at 854)], "[t]he opportunity for deliberation alone is not sufficient to apply the lower [deliberate indifference] threshold to substantive due process claims." *Fraternal Order of Police Dept. of Corr. Labor Comm. v. Williams*, 375 F.3d 1141, 1146 (D.C. Cir. 2006). On its own, the mere opportunity to deliberate or reconsider does not present the "limited circumstances" necessary to support finding conscience-shocking deliberate indifference. Doe also alleges, however, that he suffered the mistreatment while he was detained and interrogated in the government's physical custody. The fact of that custody, where Doe says the government exercised complete control over his liberty, can sufficiently present the "special circumstances" under which a government official's "deliberate indifference . . . can be truly shocking." *Butera*, 235 F.3d at 652 (quotations omitted).

Moreover, this case does not call for deliberate indifference liability based on government action taken quickly to restore order or security, for which courts have typically declined to recognize conscience-shocking conduct. *See Sacramento*, 523 U.S. at 852-533 (deliberate indifference inappropriate in circumstances like a prison riot or police chase, where an officer must make decisions "in haste" to restore and maintain lawful order). It does not appear from Doe's complaint that the detention or interrogation techniques used on him were implemented to quell violence or restore order within Camp Cropper. And though Rumsfeld says he faced weighty obligations when

-32-

Case No. 1:08-CV-1902
Gwin, J.

prosecuting the war in Iraq, he has not presented (and the Court at this stage cannot consider) evidence beyond his own contentions of competing considerations that bear on his alleged conduct. *See* [Doc. 11 at 49 (describing military's "difficult, dangerous, and deadly" tasks to suppress insurgency, train Iraqi forces, assist in Iraq's reconstruction, and gather intelligence); Doc. 33 at 41.] From the face of the complaint, it is not apparent that Rumsfeld faced a choice between competing obligations. *Cf. Benzman v. Whitman, 523 F.3d 119, 128 (2d Cir. 2008)* (dismissing deliberate indifference claim because allegations in plaintiff's complaint show defendant faced competing considerations). At this stage of litigation, and given Doe's allegations that Rumsfeld carefully evaluated his detention and interrogation policies rather than making split-second decisions, *see Sacramento, 523 U.S. at 853* (noting that deliberate indifference liability is most appropriate where officials have the chance for repeated reflection or where "extended opportunities to do better are teamed with protracted failure even to care"), the Court finds that Doe has adequately alleged Rumsfeld's deliberate indifference to his substantive due process right.

Doe's allegations adequately state his substantive due process claim even when viewed in the context of life at Camp Cropper. Rumsfeld reasons that, against the dangerous and volatile conditions in Iraq, Doe's conditions of confinement cannot fairly be said to shock the conscience. [Doc. 11 at 50-51.] But Doe bases his claim not on any rough or dangerous conditions inherent to life in Iraq, but rather on actions taken against him that he says amounted to physical and psychological abuse. Though conduct that shocks the conscience in one context may not do so in another, *see Sacramento, 523 U.S. at 850; Norris, 737 F.2d at 1152*, the Court finds that Doe's cumulative allegations of mistreatment are sufficient at this stage to state a plausible substantive due process claim based on his detention at Camp Cropper.

-33-

Case No. 1:08-CV-1902
Gwin, J.

Accordingly, through factual allegations suggesting Rumsfeld's intent to injure or deliberate indifference to the conditions of Doe's confinement, Doe has adequately pleaded a violation of his substantive due process right by alleging conduct that shocks the conscience.

2. Clearly Established

In addition to considering whether Doe's allegations could show the violation of a constitutional right, this Court must determine whether that constitutional right was "clearly established" at the time and in the context of the complained-of conduct. *Saucier*, 533 U.S. at 201-02. Rumsfeld argues that at the time and place of Doe's detention, the scope of Doe's substantive due process rights were far from settled and, accordingly, that a reasonable official in Rumsfeld's position would not have known the alleged misconduct to violate the Constitution.[10]

It has long been held that United States citizens are entitled to constitutional protections even when abroad. *Reid v. Covert*, 354 U.S. 1, 5-6 (1957) (rejecting "the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights" and finding established the concept that "the shield which the Bill of Rights and other parts of the Constitution provide to protect [a citizen's] life and liberty should not be stripped away just because he happens to be in another land.").  It was also clearly established by the time of Rumsfeld's alleged conduct that pretrial detainees enjoy fundamental constitutional rights. *See, e.g.*, *Wolfish*, 441 U.S. at 545 ("[P]retrial detainees, who have not been convicted of any crimes, retain *at least* those constitutional rights that

---

[10]The Court notes Doe's objection that Rumsfeld did not address this prong of his qualified immunity defense in any detail in its initial motion to dismiss, offering argument only upon his reply. [Doc. 29 at 49.] There may be some authority for rejecting this argument as waived. *See A.J. McNulty & Co. v. Sec'y of Labor*, 283 F.3d 328, 338 (D.C. Cir. 2002) (citing *McBride v. Merrell Dow and Pharms., Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time in a reply brief . . . entails the risk of an improvident or ill-advised opinion on the legal issues tendered." (internal citations omitted))).  However, because the Court finds in any case that Rumsfeld's qualified immunity defense fails under either prong of the *Saucier* test, and because Doe himself addresses this prong in his opposition to Rumsfeld's motion, the Court considers and rejects Rumsfeld's argument that the allegedly violated constitutional rights were not clearly established.

Case No. 1:08-CV-1902
Gwin, J.

we have held are enjoyed by convicted prisoners." (emphasis added)).  The actions alleged in Doe's

complaint, if true, would be unconstitutional if taken against a citizen detained in the United States;

that Doe's detention took place abroad does not itself render his constitutional right to be free from

such conduct unsettled.

Against this backdrop of generalized rights, Doe's substantive due process rights must

additionally be clearly established "in light of the specific context of the case." *Saucier*, 533 U.S.

at 201.  As indicated, Doe says that he was seized away from the battlefield and while he was

preparing to leave Iraq, presumptively for the United States. [Doc. 4 at 14.] Rumsfeld contends that

because no court at the time had held that a citizen enjoys "*any* constitutional rights when detained

by American military forces on a foreign battlefield pending an initial status determination," [Doc.

33 at 45 (emphasis in original)], Doe's constitutional rights at Camp Cropper cannot have been

clearly established.

Certainly, this Court must evaluate whether the allegedly violated constitutional right was

clearly established in a context specific enough to be meaningful to the present analysis and to

warrant holding a reasonable federal official liable for violating the right.  But the Court need not

require previous declarations that the constitutional right existed in identical factual circumstances.

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (noting that "officials can still be on notice that their

conduct violates established law even in novel factual circumstances"); *see, e.g.*, *United States v.

Lanier*, 520 U.S. 259, 271 (1997) ("There has never been a . . . case accusing welfare officials of

selling foster children into slavery; it does not follow that if such a case arose, the officials would

be immune from damages." (internal citation and quotation marks omitted)).  Where preexisting law

would dictate to a reasonable official that his conduct is unconstitutional, even if prior case law has

Case No. 1:08-CV-1902
Gwin, J.

not explicitly addressed identical circumstances, the unconstitutionality of that conduct may be found

clearly established. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right

must be sufficiently clear that a reasonable official would understand that what he is doing violates

that right. This is not to say that an official action is protected by qualified immunity unless the very

action in question has previously been held unlawful, but it is to say that in the light of pre-existing

law the unlawfulness must be apparent." (citations omitted)); *see also Johnson v. District of

Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008) (same).

Although the factual setting of Doe's detention may not have replicated the contexts

addressed by prior case-law, the Court finds no convincing reason that United States citizens in Iraq

should or must lose previously-declared substantive due process protections during prolonged

detention in a conflict zone abroad.  Drawing from the factual allegations in Doe's complaint, there

is little that renders Camp Cropper so distinct from other contexts that the extent of constitutionally

permissible treatment of detainees and conditions of confinement could not be clear there.  The

stakes in holding detainees at Camp Cropper may have been high, but one purpose of the

constitutional limitations on interrogation techniques and conditions of confinement (even

domestically) is to strike a balance between government objectives and individual rights even when

the stakes are high.  In light of law declaring unconstitutional conduct or conditions of confinement

that shock the conscience, as well as clearly established law recognizing constitutional protections

against certain government action for United States citizens abroad, the Court finds that Doe has set

forth facts that if true could show the violation of a clearly established constitutional right.

The outcome of this analysis is not altered by the D.C. Circuit's recent finding that was it not

clearly established in 2004 (about the time of Doe's detention) whether the Fifth Amendment applies

Case No. 1:08-CV-1902
Gwin, J.

"to aliens held in Iraq and Afghanistan." *Mohammed*, 2011 WL 2462851, at *4. Despite dicta in the *Mohammed* court's opinion that "no court has held any constitutional right applies" in Iraq and Afghanistan, *id.*, *Mohammed*'s analysis was confined to the protections afforded aliens by the extraterritorial reach of the Constitution. On the contrary, it has long been held that United States citizens enjoy constitutional protections whether at home or abroad. "Clearly, a plaintiff's citizenship often goes a long way in determining the scope of available constitutional protections." *Vance*, 694 F. Supp. 2d at 969.

The Court thus finds, under the circumstances alleged, that a reasonable federal official would have understood conscience-shocking physical and psychological mistreatment—including temperature, sleep, food, and light manipulation—of a United States citizen detainee to violate the detainee's constitutional right to substantive due process. Accordingly, Rumsfeld is not entitled to qualified immunity from Doe's substantive due process claim.

### C. Procedural Due Process

Rumsfeld also moves to dismiss, on grounds of qualified immunity, the claim that Rumsfeld violated Doe's Fifth Amendment procedural due process rights by approving practices and policies that prevented Doe from challenging his "enemy combatant" or "security internee" status through fair procedures. [Doc. 4 at 43.]

Doe essentially makes two procedural due process arguments. First, Doe alleges that the process afforded him at his two detainee status hearings failed to meet the constitutional minimums established by the Supreme Court's decision in *Hamdi v. Rumsfeld*. 542 U.S. 507 (holding that procedural due process requires citizen detainee be given notice of and opportunity to contest the factual basis for his detention before a neutral adjudicator). Specifically, Doe says he was denied

-37-

Case No. 1:08-CV-1902
Gwin, J.

notice of the factual basis for his designation, the opportunity to challenge that basis before a neutral

decision-maker, and access to evidence and witnesses. [Doc. 4 at 43-44.] Second, Doe makes an

equal protection argument:  Doe says the military denied him the rigorous due process protections

it otherwise afforded American military personnel who were alleged to have committed similar

misconduct. [Doc. 4 at 22.] To this end, Doe contends that procedural rights under the Uniform Code

of Military Justice were routinely made available to American soldiers in Baghdad and that no

legitimate governmental interest justifies withholding those same rights from civilians like Doe.

[Doc. 4 at 28-29.]

Because, as previously discussed, Doe has not alleged sufficient facts to support Rumsfeld's

personal involvement in these alleged constitutional violations, both of Doe's procedural due process

claims fail.  Without adequate allegations of Rumsfeld's involvement in the complained-of

violations, Doe cannot maintain a claim against Rumsfeld.

### D. Access to Courts

Finally, Rumsfeld moves to dismiss Doe's last claim, which asserts a denial of access to

courts.  *See Lewis v. Casey*, 518 U.S. 343, 350 (1996) (prisoners have a constitutional right of access

to courts).  Doe alleges that the policies authorized by Rumsfeld prevented Doe from challenging

the basis for and enjoining the conditions of his detention in court. [Doc. 4 at 30.]  Doe premises his

access to court claim on two grounds.  First, he alleges a denial of the right to petition for habeas

corpus. [Doc. 4 at 47.] Second, Doe alleges a separate, backwards-looking "right of access to a court

to enjoin the torture that was inflicted upon him." [Doc. 29 at 67.]

Because Doe has not sufficiently pleaded that Rumsfeld was personally involved in crafting

policies that prevented detainees' access to courts or was deliberately indifferent to the deficient

Case No. 1:08-CV-1902
Gwin, J.

enforcement of policies providing access to courts, [Doc. 4 at 47], Doe cannot overcome Rumsfeld's

qualified immunity defense to this denial-of-access claim.

Moreover, Doe's allegations of a denial of access to enjoin the conditions of his detention

ultimately fail, as Doe's requested relief under this claim merely duplicates the relief sought under

his substantive due process claim.  To plead the violation of a constitutional right to access to courts,

a plaintiff must allege: (1) the loss of "a nonfrivolous, arguable underlying claim"; (2) "official acts

frustrating the litigation" of that claim; and (3) "a remedy that could not be obtained on an existing

claim." *Christopher v. Harbury*, 536 U.S. 403, 415-21 (2002); *Broudy v. Mather*, 460 F.3d 106, 118-

20 (D.C. Cir. 2006).  These requirements ensure that plaintiffs cannot simply tack on a denial-of-

access characterization in order to litigate frivolous or duplicative claims.  *Harbury*, 536 U.S. at 415.

The Supreme Court has held that because denial-of-access claims must seek "relief

unobtainable in other suits, the remedy sought must itself be identified to hedge against the risk that

an access claim be tried all the way through, only to find that the court can award no remedy that the

plaintiff could not have been awarded on a presently existing claim."  536 U.S. at 416.  In pleading

an access claim, a plaintiff must therefore "describe any remedy available under the access claim and

presently unique to it."  *Id.* at 417-18.

Doe's denial-of-access claim explicitly identifies and seeks only monetary damages and fees,

relief otherwise available under his substantive due process *Bivens* claim.  Doe claims that, but for

the denial of his access to courts, "he could have challenged [his] torturous mistreatment" at Camp

Cropper.  [Doc. 4 at 48.] As relief, Doe demands damages, costs and fees, and "any and all other

relief to which he may appear entitled." [Doc. 4 at 49.] Because Doe has not described to any

meaningful degree relief distinct from that sought under his present substantive due process claim,

Case No. 1:08-CV-1902
Gwin, J.

he cannot maintain a separate access to courts claim premised on a challenge to the conditions of his confinement.

The Court thus grants Rumsfeld's motion to dismiss Doe's claim that he was denied access to courts to bring a habeas petition and to challenge the conditions of his detention.

### VI. Seized Property

Doe next brings two claims against Defendants Napolitano, Mueller, Bersin, and Morton, acting in their official capacities and under color of law. Doe seeks the return of property he says the government unconstitutionally seized; he also complains that the government has denied his right to international travel. [Doc. 4 at 64-66.]

With regard to Doe's return of seized property claim, the government moves to dismiss this claim both for lack of subject matter jurisdiction, under Rule 12(b)(1), and for failure to state a claim, under Rule 12(b)(6). The government says Doe fails to show that his claim does not fall under an exception to the Administrative Procedure Act's waiver of sovereign immunity and in any case does not challenge a final, judicially reviewable, agency action. [Doc. 14.]

The Court notes that although the United States moves to dismiss Doe's claim in part on jurisdictional grounds under Rule 12(b)(1), the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq., "is not a jurisdiction-conferring statute." *Oryszak v. Sullivan*, 576 F.3d 522, 524 (D.C. Cir. 2009) (quoting *Trudeau v. F.T.C.*, 456 F.3d 178, 183 (D.C. Cir. 2006)). The Court has subject-matter jurisdiction over this claim under 28 U.S.C. § 1331 (granting "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"), which "confer[s] jurisdiction on federal courts to review agency action." *Id.* at 524-25 (quoting *Califano v. Sanders*, 430 U.S. 99, 105 (1977)) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 317 n.47 (1979) and *Ass'n*

Case No. 1:08-CV-1902
Gwin, J.

*of Nat'l Advertisers v. F.T.C.*, 617 F.2d 611, 619 (D.C. Cir. 1979)) (alteration in original). Accordingly, a plaintiff whose challenge fails to meet or comply with the APA's judicial review provisions, 5 U.S.C. §§ 701–706, has simply failed to state a claim; the Court has not lost jurisdiction. *See id.* at 525 (that the APA is not jurisdictional "applies with equal force" to the APA's provision excluding review of "agency action committed to agency discretion by law" as to its provision limiting judicial review to "final agency action," because both "limit[] the cause of action provided by the APA."). The Court thus considers the government's motion to dismiss under Rule 12(b)(6).

In general, the judicial review provisions of the APA waive the United States' sovereign immunity for non-monetary suits challenging a final federal agency action or an agency's failure to take legally-required agency action. As a threshold matter, the APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Here, because Doe challenges an agency action—the government's denial of his request for the return of his property—directly under the APA, his claim falls under the APA's second ("no other adequate remedy") category.[11]

The APA defines "agency action" expansively to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13). At the same time, the APA permits challenges only to "agency action" that is "final." "The Supreme Court

---

[11] Doe does not purport to base his claim on any constitutional or statutory authority requiring the return of seized property under the circumstances present here. Moreover, Doe appropriately characterizes his claim as one challenging an agency action, rather than an agency's failure to act. Accordingly, the government's argument that Doe is limited to challenging an agency's failure to take an action that the agency is *required* to take, [Doc. 34 at 18], is misplaced. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004) ("[T]he only agency action that can be compelled under the APA is action legally *required*."); *id.* at 64 (noting that a plaintiff must "assert that an agency *failed* to take a discrete agency action that it is required to take." (emphasis added)).

Case No. 1:08-CV-1902
Gwin, J.

has explained that to be 'final,' an agency action must 'mark the consummation of the agency's decisionmaking process, and must either determine rights or obligations or occasion legal consequences.'" *Friends of The Earth, Bluewater Network Div. v. United States Dept. of the Interior*, 478 F. Supp. 2d 11, 23 (D.D.C. 2007) (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 482 (2004)).  In other words, the agency's decision-making process must culminate in the challenged agency action and that challenged action must have "an actual or immediately threatened effect." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990).

       The government correctly points out that Doe has not sufficiently pleaded that he challenged a discrete, final agency action, as required to bring suit under the APA. [Doc. 14 at 15-17.] Doe's complaint says that Doe petitioned the United States Army for the return of certain property taken from him during his arrest and detention at Camp Cropper, that the United States refused this petition, and that, as a result, Doe has not been able to access the seized property. [Doc. 4 at 66.] Through these factual allegations, Doe has sufficiently identified a discrete agency action and its actual effect, but he has not pleaded any factual allegations that would support even an inference that the government's refusal was a "final agency action" or the outcome of any decision making process. Doe offers only his own legal conclusion that "[t]he United States' ruling on this matter constitutes final agency action under the Administrative Procedure Act . . . ." [Doc. 4 at 66.] Without any accompanying factual allegations—describing, for example, in what form Doe made his petition to the Army, if Doe repeatedly petitioned the government, or the details of the United States' or the Army's response to such petition—this conclusory assertion alone is insufficient to state a claim challenging "final agency action" under the APA. *Iqbal*, 129 S. Ct. 1937 at 1949; *cf. Vance v. Rumsfeld*, No. 06-CV-6964, 2009 WL 2252258, at *5 (N.D. Ill. July 29, 2009) (finding factual

Case No. 1:08-CV-1902
Gwin, J.

allegations that Army refused to return seized property *and* that the Department of Justice stated "that the government does not intend to return any of their property" a sufficient challenge to "final agency action").

The government also argues that the "military authority exception" to the APA's judicial review provisions bars Doe's claim.[12/] [Doc. 14 at 12-14.] The APA excludes from its provisions judicial review of any "military authority exercised in the field in time or war or in occupied territory . . . ." 5 U.S.C. § 701(b)(1)(G).  This exception applies to "military commands made in combat zones or in preparation for, or in the aftermath of, battle." *Doe v. Sullivan*, 938 F.2d 1370, 1380 (D.C. Cir. 1991).  Because, irrespective of the military authority exception's application to Doe's claim, this Court finds that Doe has not adequately pleaded that he challenges a final agency action, the Court does not decide this issue.[13/]

Accordingly, the Court grants the government's motion to dismiss Doe's return of seized property for failure to state a claim under the APA.  However, the Court permits Doe to amend his

---

[12/]The United States says only that the so-called "military authority exception" bars review of Doe's claim.  It does not argue that any other exception to the APA's general waiver of sovereign immunity applies. *See, e.g.*, 5 U.S.C. § 701(a) (precluding judicial review under the APA of "agency action [that] is committed to agency discretion by law.").

[13/] Though Doe does not contest that the military authority exception would likely preclude challenges to the seizure of his property, Doe also clarifies that his challenge is not to the initial seizure of his property, but rather to the "United States" decision not to return [the property] when asked to do so" years after its seizure. [Doc. 20 at 14.] The Court notes that it is unclear from the record where Doe's property was held, and under what authority, at the time the government allegedly refused to return it, suggesting that Doe's challenge to the retention of his property would not be categorically precluded by the military authority exception.

The government's argument that property retention cannot be distinguished from property seizure, [Doc. 34 at 5], would have the Court draw a categorical line, unsupported by legislative history or controlling case law, to avoid what should be a case-specific inquiry.  *See Rosner v. United States*, No. 01-CV-1859, 2002 WL 31954453, at *3 (S.D. Fla. Nov. 26, 2002) (finding that "[d]iscovery on [the military authority exception's applicability] is critical because of the fact-intensive nature of this inquiry necessary to permit the Court to determine if it has jurisdiction over the non-monetary claims."); *Id.* (noting a lack of legislative history and case law on the military authority exception).  The Court notes that there may be some scenarios in which the failure to return property is conceptually and functionally distinct from the original decision to seize it.  Keeping in mind the military authority exception's limited purpose of insulating only war functions or wartime decisions from judicial review, this distinction could be important.

Case No. 1:08-CV-1902
Gwin, J.

complaint to assert factual allegations supporting a reasonable inference that the government's

refusal to return his property was a "final agency action," if such allegations may be pleaded in good

faith.

### VII. Right to Travel

In addition, the government asks the Court to order a more definite statement of Doe's right

to travel claim.  Doe alleges that the government "denied and unfairly burdened [Doe's] exercise of

his right of international travel in violation of his constitutional rights." [Doc. 4 at 64.] In support

of that claim, Doe says that he has been placed on a terrorist watch list, which causes him to be

detained and searched every time he returns to the United States from international travel. [Doc. 4

at 25.] Doe adds that his requests to be removed from the watch list have been denied.  [Doc. 4 at

26.]

The government contends that these allegations are so vague that it cannot reasonably

respond to Doe's right to travel claim.  [Doc. 14; Doc. 34.] Accordingly, the government argues, the

Court should require Doe to identify the jurisdictional basis for his claim, the particular provisions

of the Constitution he alleges were violated, and the precise nature of the injunctive relief he seeks.

[Doc. 14 at 18.]

Because, however, Doe's complaint meets the liberal pleading requirements of Rule 8,

granting the government's motion would amount to requiring something more particular than "a

short and plain statement" of the plaintiff's claim.  Fed. R. Civ. P. 8(a).  Rule 8 requires only that

a plaintiff plead facts supporting his claim; it does not demand that he explicitly name the legal basis

for this claim.  *Id.*; *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000).

Doe's failure to specify the vehicle, jurisdictional or otherwise, for his right to travel claim

Case No. 1:08-CV-1902
Gwin, J.

does not make this claim unanswerable.  The government does not challenge Doe's contention that the Court may exercise jurisdiction over this claim under 28 U.S.C. § 1331.  Moreover, for plaintiffs "suffering legal wrong because of agency action," the APA permits "relief other than money damages" against the United States, or against government officers acting in their official capacity. 5 U.S.C. § 702; 5 U.S.C. § 706(2)(B).  Here, Doe alleges that government officers, acting under color of law, violated his constitutional rights.  He also seeks injunctive relief to prevent further constitutional violations and identifies an agency action—the denial of his petitions to be removed from the watch list—related to these violations. [Doc. 4 at 25-26, 64-65.] Having pleaded this factual basis, Doe's failure to cite to the APA is not fatal to his claim.  5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1206 (3d ed. 2004) (A "district court may sustain jurisdiction when an examination of the entire complaint reveals a proper basis for assuming subject matter jurisdiction other than one that has been improperly asserted by the pleader . . . .").  Although, as the government argues, Doe ultimately "bears the burden of proving that the government as unequivocally waived its immunity" under the APA, Tri-State Hosp. Supply Corp. v. United States, 341 F.3d 571, 575 (D.C. Cir. 2003), that burden is not appropriately imposed under Rule 12(e).[14]

For the same reasons, Doe's claim is not impermissibly vague for failing to name a particular provision of the Constitution he claims was violated.  The government does not dispute that the factual allegations in Doe's complaint support one or more constitutional claims, and they do not move to dismiss Doe's allegations for failure to state a claim.  Instead, the government would have Doe specify the exact constitutional basis for his right to travel claim. [Doc. 34 at 21.] Yet simply

---

[14]The government makes much of Doe's statement that he seeks remedy for violations of his right to travel "only under the Constitution." [Doc. 4 65.] They argue that this precludes Doe from bringing this claim under the APA.  While this argument is certainly appropriate for a motion to dismiss or for summary judgment, it does not render Doe's complaint impermissibly vague.

-45-

Case No. 1:08-CV-1902
Gwin, J.

because Doe's factual allegations could support one or more constitutional claims does not render it "so vague or ambiguous" that the government cannot reasonably respond.

Finally, the government's contention that Doe must specify the type of injunctive relief he seeks is without support. The government argues that knowing "more precisely what plaintiff wants" is necessary in its assessment of applicable defenses. [Doc. 14 at 22.] Although Rule 8 calls for "a demand for the relief sought," it does not require a plaintiff to describe the nature of his desired relief in great detail. Fed. R. Civ. P. 8(a)(3). Doe specified in his complaint that he "seeks an injunction to prevent further infringement of his liberties." [Doc. 4 at 65.] This statement is sufficient under Rule 8. Should the government desire more for its own edification, Doe has noted in response to the government's motion that he seeks "to prevent further unreasonable and unconstitutional detention during international travel." [Doc. 20 at 24.] The government's argument that even this statement is too vague, [Doc. 34 at 22], is simply an unwarranted attempt to narrow the scope of Doe's complaint prematurely.

Accordingly, the Court denies the government's motion for a more definite statement.

### VIII. Conclusion

For the foregoing reasons, the Court **DENIES** Rumsfeld's motion to dismiss Doe's substantive due process claim. The Court **GRANTS** Defendant Rumsfeld's motion to dismiss Doe's procedural due process and access to courts claims.

The Court further **GRANTS** the government's motion to dismiss Doe's return of seized property claim; the Court permits Doe leave to amend his complaint if he can plead, in good faith, factual allegations supporting a reasonable inference that the government's refusal to return his property was a "final agency action." Finally, the Court **DENIES** the government's motion for a

Case No. 1:08-CV-1902
Gwin, J.

more definite statement of Doe's right to travel claim.

      IT IS SO ORDERED.


Dated: August 2, 2011                       *s/  James S. Gwin*
                                            JAMES S. GWIN
                                            UNITED STATES DISTRICT JUDGE